**2013 UT App 244**

# THE UTAH COURT OF APPEALS

JEFF BURNINGHAM,
Plaintiff and Appellee,
*v.*
WESTGATE RESORTS, LTD.,
Defendant and Appellant.

Opinion
No. 20120469-CA
Filed October 10, 2013

Third District, Silver Summit Department
The Honorable Keith A. Kelly
No. 100500940

Troy L. Booher, Erin Bergeson Hull,
Noella A. Sudbury, Michael A. Gehret, and
Douglas P. Farr, Attorneys for Appellant
Jonathan O. Hafen and Mary Ann C. May,
Attorneys for Appellee

SENIOR JUDGE RUSSELL W. BENCH authored this Opinion, in
which JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR.
concurred.[1]

BENCH, Senior Judge:

¶1 Westgate Resorts, Ltd. (Westgate) appeals from the district court's entry of summary judgment in favor of Jeff Burningham in Burningham's action for the return of $89,900 that he had paid to

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11-201(6).

Westgate as a deposit on the purchase of a condominium unit. We affirm.


BACKGROUND

¶2    In 2006, Burningham and Westgate entered into a real estate purchase contract (the REPC) whereby Burningham agreed to purchase a Park City condominium unit from Westgate for $899,000. Pursuant to the REPC, Burningham made a 10% deposit of $89,900, which was to be retained by Westgate as liquidated damages if Burningham defaulted. As the 2007 closing date approached, real estate market conditions worsened, and Burningham refused to close. A dispute arose between the parties as to whether Burningham was entitled to a refund of the deposit, with Burningham alleging that Westgate had made misrepresentations to fraudulently induce him to enter into the REPC.

¶3    The parties spent several months negotiating in an attempt to resolve the deposit dispute without litigation. Burningham proposed to settle the matter by allowing Westgate to retain $30,000 of the deposit and return the rest, but Westgate took the position that it was entitled to the entire deposit and declined Burningham's offer. Burningham then asked Westgate to sell him the condominium unit for a substantially reduced price, and Westgate agreed.

¶4    In September 2010, the parties settled their dispute by executing a second contract (the Agreement) for the sale of the condominium unit, this time for the reduced purchase price of $462,500. The only deposit contemplated by the Agreement was the $89,900 that Burningham had previously paid Westgate under the REPC. The Agreement designated the $89,900 as the "Initial Deposit" and stated its due date as "Already deposited." The Agreement purported to resolve all outstanding issues between the parties arising under the REPC and stated that it was "wholly

integrated and shall supersede any and all previous and current understandings and agreements between the Buyer and Seller." The Agreement also expressly abrogated the REPC, stating that the Agreement "replaces in its entirety a previous purchase and sale agreement entered into between Buyer and Seller with respect to a unit."

¶5 Unlike the REPC, the Agreement contained a provision granting Burningham the right to terminate the Agreement in his sole discretion merely by giving notice to Westgate within seven days of the Agreement's effective date. Paragraph 38.1 of the Agreement, entitled "Buyer's Due Diligence," stated,

> Buyer, in its sole discretion, may terminate this Agreement within seven (7) days of the Effective Date (as defined in Paragraph 44 of this Agreement) by delivering written notice to Seller . . . . If Buyer timely terminates this Agreement under this Section 39.1,[2] the deposit(s) paid shall be returned to Buyer; thereupon, Buyer shall be released from all further obligations under this Agreement, except as specifically set forth herein.

Burningham exercised this termination option by giving timely written notice to Westgate. However, Westgate refused to return Burningham's deposit, contending that neither party had intended to provide Burningham the unilateral right to cancel the Agreement and recover the full $89,900 originally deposited under the REPC.

¶6 Burningham sued Westgate for the return of the deposit, and Westgate brought counterclaims arguing mutual mistake and seeking declaratory relief under the Agreement. Burningham

---

2. We accurately quote paragraph 38.1's reference to "this Section 39.1," and we note that the Agreement does not contain a paragraph or section 39.1.

moved for summary judgment, arguing that his entitlement to the deposit pursuant to paragraph 38.1 of the Agreement was clear as a matter of law. Westgate opposed the motion, arguing that the parties' mutual intent in executing the Agreement was that the $89,900 be treated as a nonrefundable credit towards the purchase price of the condominium unit.

¶7    Westgate argued that Burningham's release of all his claims under the REPC evidenced his intent to forfeit the deposit. Westgate also submitted a declaration from its sales agent who had negotiated the Agreement. The sales agent's declaration stated that it was Westgate's understanding that both parties intended "that Westgate would retain Burningham's deposit under [the REPC] as liquidated damages, but would also reduce the price of the [condominium unit] in an amount equal to the forfeited deposit, subject to closing." The sales agent based this conclusion on his "discussions and interactions" with Burningham leading up to the execution of the Agreement.

¶8    The district court granted Burningham's motion for summary judgment. In its summary judgment order, the district court identified multiple undisputed facts, including the existence of paragraph 38.1's termination and refund provisions. The district court then concluded that the Agreement was an integrated contract, that it unambiguously identified the $89,900 as the "deposit," and that it unambiguously provided for the return of that deposit to Burningham in the event that he timely terminated the Agreement. The district court also concluded that there were no circumstances such as fraud or mistake that would require the court to consider Westgate's extrinsic evidence—i.e., the sales agent's declaration—despite the Agreement's unambiguous language. Accordingly, the district court determined that Westgate had breached the Agreement as a matter of law and awarded Burningham judgment for $89,900 plus interest and attorney fees pursuant to the Agreement.

¶9 Westgate filed a motion for new trial in the district court, arguing that the district court had erred in failing to consider extrinsic evidence because Westgate had raised a claim of mutual mistake and because paragraph 38.1's reference to "this Section 39.1" constituted a scrivener's error. The district court denied Westgate's motion, concluding that the sales agent's declaration failed to create a fact question on *mutual* mistake, as opposed to a unilateral mistake by Westgate. The district court also concluded that the reference to the nonexistent section 39.1 was an "obvious typographical error" and that Westgate had presented no evidence that the deposit-refund language in the last sentence of paragraph 38.1 was intended to be triggered by any other actual or proposed termination language. Westgate appeals.

## ISSUES AND STANDARDS OF REVIEW

¶10 Westgate argues that the district court erred in granting summary judgment to Burningham because there were material fact questions as to the parties' intent on the refundability of the $89,900. Specifically, Westgate argues that evidence of mutual mistake, scrivener's error, and the lack of a meeting of the minds each raise a material fact question on the parties' intent so as to preclude summary judgment. "An appellate court reviews a trial court's 'legal conclusions and ultimate grant or denial of summary judgment' for correctness and views 'the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.'" *Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, ¶ 8, 268 P.3d 872 (quoting *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600). "A motion for summary judgment may not be granted if . . . there is a factual issue as to what the parties intended." *Id.* (omission in original) (citation and internal quotation marks omitted).

ANALYSIS

¶11   The district court concluded that, pursuant to paragraph 38.1 of the Agreement, Burningham timely terminated the Agreement and was entitled to a refund of his $89,900 deposit as a matter of law. Notwithstanding the language of paragraph 38.1, Westgate argues that extrinsic evidence—primarily the declaration of its sales agent—creates material questions of fact on its arguments of mutual mistake, scrivener's error, and the parties' failure to reach a "meeting of the minds." We address each of these arguments in turn.

## I. Mutual Mistake

¶12   Westgate first argues that it provided the district court with extrinsic evidence of a mutual mistake regarding whether the $89,900 was to be refundable to Burningham under the Agreement. A mutual mistake of fact can provide the basis for equitable rescission or reformation of a contract even when the contract appears on its face to be a "complete and binding integrated agreement." *West One Trust Co. v. Morrison*, 861 P.2d 1058, 1061 (Utah Ct. App. 1993) (citation and internal quotation marks omitted). "A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain." *The Cantamar, LLC v. Champagne*, 2006 UT App 321, ¶ 38, 142 P.3d 140 (citation and internal quotation marks omitted). Westgate argues that its sales agent's declaration, viewed in light of the parties' course of conduct leading up to the Agreement, raises a fact question as to whether the inclusion of paragraph 38.1's refund language in the Agreement was a mutual mistake.

¶13   The sales agent's declaration summarizes, from Westgate's perspective, the events leading up to the execution of the Agreement. The declaration clearly provides evidence that *Westgate* did not intend for the $89,900 to be refundable, stating that "at no time did Westgate intend for the [$89,900] to be considered a

refundable deposit under the [Agreement]." It also provides evidence of Westgate's subjective understanding that Burningham shared its intent, stating that the sales agent "understood these to be Burningham's intentions based on [the agent's] discussions and interactions with [Burningham] leading up to the [Agreement]."

¶14    What the sales agent's declaration does not do is provide evidence of *Burningham's* intent, as opposed to Westgate's understanding of that intent. The declaration does not provide the substance of any of the sales agent's "discussions and interactions" with Burningham that would provide evidence of Burningham's intent.[3] Instead, the declaration relies on Burningham's silence, stating that "[a]t no time did Burningham indicate . . . that he intended the [$89,900] to be a refundable deposit under the [Agreement] or that he interpreted it to be the 'deposit' referenced in Paragraph 38.1 of the [Agreement]."

¶15    We agree with the district court that the sales agent's declaration "does not show that Mr. Burningham was also mistaken on [the deposit] issue." The declaration provides evidence only of unilateral mistake by Westgate, not the mutual mistake required to establish grounds for equitable rescission of the Agreement. We therefore conclude that the declaration did not raise a material question of fact on mutual mistake so as to preclude summary judgment.

---

3. Westgate does point to an email from Burningham during the course of the parties' negotiations wherein Burningham offered to "appl[y] my deposit" from the REPC to the proposed reduced-price purchase of the condominium under the Agreement. However, we see nothing in this statement to support Westgate's argument that the Agreement was to treat the $89,900 as a non-refundable credit, rather than as a deposit subject to the Agreement's various refund provisions.

¶16    Westgate also argues that it was clearly entitled to retain the $89,900 under the REPC and that it would therefore "def[y] all logic and common sense" to make the money refundable under the terms of the Agreement. To the extent that this argument even bears on the question of mutual mistake, we observe that the proper disposition of the $89,900 under the REPC was disputed at the time the parties entered into the Agreement. By entering into the Agreement, Westgate obtained the release of Burningham's fraud and related claims—which, if successful, would likely have entitled Burningham to an award of attorney fees in addition to the $89,900. Further, the Agreement did not only address the $89,900 but also provided another opportunity for Westgate to sell the condominium unit, which had lost substantial value over the course of the parties' dealings. It may well have been in Westgate's business interest to risk losing the deposit in order to divest itself of the devalued condominium unit for the price stated in the Agreement. Under these circumstances, we see nothing in the course of the parties' conduct to support Westgate's argument that both Westgate *and* Burningham were mistaken as to the Agreement's refund language.

## II. Scrivener's Error

¶17    Next, Westgate argues that there is a material issue of fact as to whether the Agreement contains a scrivener's error. The alleged scrivener's error is contained in the refund language of paragraph 38.1 of the Agreement, which states, "If Buyer timely terminates this Agreement under *this Section 39.1*, the deposit(s) paid shall be returned to Buyer . . . ." (Emphasis added.) Westgate argues that the district court erred when it failed to consider extrinsic evidence regarding the effect of the alleged scrivener's error. *See Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, ¶ 11, 268 P.3d 872 (explaining that scrivener's error is a type of mutual mistake and that the court must therefore consider extrinsic evidence to determine the parties' intent).

¶18    We see no error by the district court because Westgate failed to present any extrinsic evidence that the reference to "this Section 39.1" was intended to refer to any section or paragraph other than the existing paragraph 38.1 of the Agreement. For example, Westgate presented no testimony from the sales agent or anyone else that the Agreement was actually intended to refer to another section. By contrast, in *Wolf Mountain Resorts, LC v. ASC Utah, Inc.*, 2011 UT App 425, 268 P.3d 872, the party defending the actual language of a contract "opposed a claim of scrivener's error with the affidavit of the scrivener himself," explaining that the language of the document was exactly as intended. *See id.* ¶ 12 n.1. Further, in *Wolf Mountain*, the actual language of the document was internally consistent, as the alleged scrivener's error involved the mixing up of the two existing terms "Mortgagee" and "Mortgagor." *See id.* ¶¶ 2–7. Here, there is no evidence of any actual or proposed section 39.1 to which the Agreement could have referred.[4]

¶19    Under these circumstances, we see no material issue of fact on whether paragraph 38.1's reference to "this Section 39.1" was a scrivener's error. Accordingly, the district court did not err in characterizing the reference as an "obvious typographical error" that did not preclude summary judgment.

### III. Meeting of the Minds

¶20    Westgate's final argument is that there is a disputed issue of material fact as to whether the parties reached a "meeting of the minds" on the meaning of "deposit(s) paid" as that term is used in paragraph 38.1 of the Agreement. Under paragraph 38.1, deposits

---

4. Westgate suggests on appeal that the disputed language may have been intended to "deliberately refer[] to a section that does not exist in this particular contract so the cancellation provision does not apply." However, Westgate presented no evidence of this interpretation to the district court.

paid were to be refunded to Burningham upon his timely termination of the Agreement. However, Westgate argues that the parties had very different intentions as to whether the $89,900 constituted a refundable deposit "paid" under the Agreement—as opposed to money "already deposited" under the REPC—and, thus, that there was never a meeting of the minds on this issue.

¶21   Westgate correctly identifies a "meeting of the minds" as a necessary element of contract formation. *See, e.g.*, *Terry v. Bacon*, 2011 UT App 432 , ¶ 21, 269 P.3d 188 ("Under general contract law, it is fundamental that there be a meeting of the minds as to all essential features of a contract."). "[T]his meeting of the minds must be spelled out, either expressly or implicitly, with sufficient detail to be enforced." *Republic Grp., Inc. v. Won-Door Corp.*, 883 P.2d 285, 294 (Utah Ct. App. 1994). Here, the terms of the parties' agreement are contained in a written contract, the Agreement, and we look to that document to evaluate whether the parties reached the required meeting of the minds on the deposit issue. *See United States Fid. & Guar. Co. v. United States Sports Specialty Ass'n*, 2012 UT 3, ¶ 16, 270 P.3d 464 ("The written policy evinces a 'meeting of the minds' between the insurer and the insured."); *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207–08 (Utah 1987) (evaluating the parties' "meeting of the minds" by examining their written contract).

¶22   The Agreement clearly states that the purchase price for the condominium unit was $462,500, and it identifies only one deposit—the "Initial Deposit" of $89,900. The due date for the deposit is expressed as "Already deposited." The Agreement then identifies multiple circumstances in which the deposit would be refunded to Burningham, including Burningham's inability to obtain financing, Westgate's inability to provide clear title, default by Westgate, unremedied casualty loss to the condominium unit prior to closing, and termination of the Agreement by Burningham under paragraph 38.1. These provisions all use slightly different terminology to describe the deposit refund: "deposit(s) hereunder shall be returned to Buyer," "a full refund of Buyer's deposit," "the

return of Buyer's deposits," "all deposits shall be returned to the Buyer," and paragraph 38.1's "deposit(s) paid shall be returned to Buyer."

¶23 Even on summary judgment, Westgate's meeting of the minds argument must be evaluated against these provisions of the Agreement. *See McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶¶ 11–14, 307 P.3d 650 (affirming summary judgment because affidavit of party's intent was insufficient to create fact question in light of unambiguous writings to the contrary). Westgate's argument, supported by the sales agent's declaration, is that Westgate always understood the $89,900 to represent a nonrefundable credit against the price of the condominium unit. This understanding is flatly contradicted by the Agreement, which states that $89,900 was a deposit rather than a credit and was refundable in multiple circumstances, including Burningham's timely termination of the contract pursuant to paragraph 38.1.

¶24 "In the context of contract formation, the Utah appellate courts have held that 'each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it.'" *Id.* ¶ 12 (quoting *John Call Eng'g, Inc.*, 743 P.2d at 1208). "Furthermore, sophisticated business parties are charged with knowledge of the terms of the contracts they enter into." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 28, 245 P.3d 184 (citation and internal quotation marks omitted).[5] Given these principles and the clear refund language contained in the Agreement, we have no difficulty in concluding that, legally speaking, Westgate and Burningham reached a meeting of the

_____

5. We note that the district court recognized as an undisputed fact that "[b]oth Burningham and Westgate are sophisticated parties and were represented by legal counsel" while negotiating the Agreement.

minds on the deposit issue when they both executed the Agreement.

¶25   We reach this conclusion despite Westgate's assertion on appeal that the Agreement contemplated a distinction between deposits "paid" and deposits "[a]lready deposited." The Agreement contains no express distinction between those terms, and all references to the deposit throughout the Agreement appear by their plain language to refer to the only deposit identified in the Agreement—the "Initial Deposit" of $89,900. *See generally Nolin v. S & S Constr., Inc.*, 2013 UT App 94, ¶ 12, 301 P.3d 1026 ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." (citation and internal quotation marks omitted)). In light of this plain language, Westgate's alternative interpretation is not reasonable, and we see no ambiguity in the Agreement. *See Daines v. Vincent*, 2008 UT 51, ¶ 30 & n.5, 190 P.3d 1269 ("[A]ny contended for interpretation must be 'reasonably supported by the language of the contract.'" (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995))).

## CONCLUSION

¶26   The district court correctly concluded that Westgate's evidence demonstrated only a unilateral mistake by Westgate as to whether the $89,900 was refundable and did not raise a material fact question on mutual mistake as argued by Westgate. The district court also appropriately corrected the scrivener's or typographical error in the Agreement referring to "this Section 39.1," and the court correctly rejected Westgate's "meeting of the minds" argument in light of the Agreement's clear language that the $89,900 constituted refundable "deposit(s) paid." For these reasons, we affirm the district court's entry of summary judgment in favor of Burningham, and we remand this matter to the district

court for a determination of Burningham's reasonable attorney fees incurred on appeal.[6]

--------

6. The district court awarded Burningham his attorney fees below pursuant to an attorney fees clause in the Agreement, and Burningham has requested in his appellee's brief that he be awarded his attorney fees on appeal pursuant to the Agreement. *See generally* Utah R. App. P. 24(a)(9), (b) (requiring an appellee seeking to recover attorney fees incurred on appeal to "state the request explicitly and set forth the legal basis for such an award"). Because Burningham was awarded attorney fees below, properly requested his fees incurred on appeal, and prevailed on appeal, he is entitled to an award of reasonable appellate attorney fees. *See Robertson's Marine, Inc. v. I4 Solutions, Inc.*, 2010 UT App 9, ¶ 8, 223 P.3d 1141 ("The general rule is that when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." (citation and internal quotation marks omitted)).